Percy McDONALD, Plaintiff,

v.

BOARD OF TRUSTEES OF the UNIVERSITY OF ILLINOIS et al., Defendants.

Robert MARSHALL, Plaintiff,

v.

BOARD OF TRUSTEES OF the UNIVERSITY OF ILLINOIS et al., Defendants.

Kevin SULLIVAN, Plaintiff,

v.

BOARD OF TRUSTEES OF the UNIVERSITY OF ILLINOIS et al., Defendants.

Nos. 74 C 306 to 74 C 308.

United States District Court, N. D. Illinois, E. D.

March 14, 1974.

Paul M. Lurie, Fohrman, Lurie, Holstein, Sklar & Cottle, Ltd., Chicago, Ill., for plaintiffs.

John C. Tucker, Lynne E. McNown, Carol R. Thigpen, Jenner & Block, Chicago, Ill., for defendants.

## OPINION

MARSHALL, District Judge.

Plaintiffs in these three related cases, Percy McDonald, Robert Marshall and Kevin Sullivan, are currently enrolled as second-year students in the University of Illinois College of Medicine at the Medical Center, Chicago, Illinois (the "College of Medicine"). All three plaintiffs were charged with cheating on the June, 1973 freshman certifying comprehensive examination (the "freshman comprehensive examination"). The charges were heard by the College of Medicine Committee on Student Discipline (the "College Committee"), on referral from the Executive Dean of the College of Medicine. On December 12, 1973, after an extensive evidentiary hearing at which plaintiffs were represented by counsel of their choice, the College Committee found that each plaintiff had cheated as charged and recommended that each be expelled from the University. The recommendation of expulsion was tempered, however, with the provision that each plaintiff be permitted to take the June, 1974 freshman comprehensive examination and, if he passes it, be permitted to re-enroll in the College of Medicine as a sophomore in September of 1974.

Pursuant to established and written rules of procedure,[1] plaintiffs appealed the recommendation of the College Committee to the Senate Committee on Student Discipline (the "Senate Committee") which, on January 28, 1974, upon the evidence adduced before and the findings of the College Committee, affirmed the recommendations.[2] Thereupon plaintiffs were expelled.

Plaintiffs then brought these actions claiming that the expulsions deprived them of their property or liberty without due process of law in violation of rights guaranteed them by the Fourteenth Amendment to the Constitution of the United States and the Civil Rights Act, 42 U.S.C. § 1983. They seek declaratory, injunctive and money damages relief. Jurisdiction is based on 28 U.S.C. §§ 1343, 2201 and 2202.

Defendants are the Board of Trustees of the University of Illinois, a public corporation created and supported by the State of Illinois, and charged with the responsibility of maintaining the University of Illinois and all of its colleges, divisions and departments, including the College of Medicine (Ill.Rev. Stat.1971, ch. 144, § 22 et seq.), and various officials of the College of Medicine including the Executive Dean, the members of the College Committee and the members of the Senate Committee.

The court's jurisdiction of either the subject matter or the person of the corporate or individual defendants has not been challenged. In view of the nature of the University of Illinois as a State created and supported institution and the official rules of the individual defendants within the University (and particularly the College of Medicine)

and the nature of plaintiffs' interests in their pursuit of their professional education and attendant professional careers, the court is content that jurisdiction is present. Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Dixon v. Alabama Board of Education, 294 F.2d 150 (5th Cir. 1961). More challenging however, is the question of the extent to which the Court can intrude into and exercise a supervisory hand in the resolution of the essentially academic disputes which are presented here under the aegis of the Fourteenth Amendment and the Civil Rights Act.

Plaintiffs have been pursuing their second-year studies since their expulsion pursuant to a temporary restraining order issued by the court on February 1, 1974 and thereafter extended until today. On February 11, 1974, the court received evidence (consisting of the transcript of proceedings before the College Committee) and heard arguments on plaintiffs' motions for preliminary injunctions, announcing prior thereto, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, that evidence received at that hearing would be considered by the court in any trial on the merits.

Prior to hearing on their motions for preliminary injunctions, plaintiffs moved pursuant to Rule 56(a) and (d) of the Federal Rules of Civil Procedure for summary judgment as to their prayers for equitable relief asserting that "there is no genuine issue as to any material fact and they are entitled to judg-

---

1. Student Disciplinary Procedure University of Illinois at the Medical Center, attached as Exhibit B to the affidavit of James Martin in opposition to plaintiffs' motions for temporary restraining order. No complaint is made as to the adequacy or fairness of the procedures as a whole. But, see fn. 2, *infra*.

2. In their complaint here plaintiffs do allege that the Senate Committee "refused to allow any argument or briefs or evidence request-

ed to be submitted by plaintiff[s]." Para. 14 of each complaint. The allegation was not urged in hearings before this court. No showing was made as to the "evidence" plaintiffs requested the opportunity to offer to the Senate Committee. In light of the hearing afforded plaintiffs before the College Committee, any complaint regarding the appeal afforded them must be regarded as insubstantial.

ment as a matter of law." Thereafter, and after the hearing on the motions for preliminary injunctions, the defendants presented their cross-motions for summary judgment pursuant to Rule 56(b). Both motions for summary judgment rely upon the transcript of evidence adduced before the College Committee. Accordingly, the case is in a fit posture for ruling on the merits as well as on plaintiffs' motions for preliminary injunctions. To the extent that findings and conclusions are required by Rules 52(a) and 65, this memorandum is submitted in lieu thereof.

One final procedural observation is in order before turning to the merits. Plaintiffs were not jointly charged before the College Committee. They elected, however, to stand trial together with the assurance of the Committee that their cases would receive individual consideration. Here they filed individual actions which, because they presented common questions of law, were, for purposes of economy of time, consolidated for hearing. Each plaintiff's case has, however, received individual consideration.

In the fall of 1971, Percy McDonald, Robert Marshall and Kevin Sullivan enrolled in the College of Medicine as first-year students. Each is black. Each was accepted as a participant in the Medical Opportunities Program, the purpose of which is to increase minority group participation in the medical profession through, inter alia, the utilization of standards of admission to medical school different from those employed in screening non-participating applicants.

McDonald had graduated in the upper 10% of his class from Lane Technical High School in Chicago in June, 1967. His undergraduate work in biology was done at the University of Illinois in Chicago. He had applied for and been accepted as a medical student at Loyola University in Chicago before matriculating at the University of Illinois. Throughout his college days he had been employed full time in a dress shop.

During the summer of 1972, after one year of medical school, he worked at Cook County Hospital and the Veterans Administration Hospital as a laboratory technician.

Marshall graduated from Hyde Park High School in Chicago in June, 1963. He enlisted in the Army from which he was discharged after service in Viet Nam in April, 1967. After a semester at Loop Junior College, he enrolled at Roosevelt University in Chicago from which he received a Bachelor of Science degree in June, 1971. He applied for and was accepted as a student at the Chicago Medical School before matriculating at the University of Illinois.

Sullivan graduated first in his class from Calumet High School in Chicago in June, 1968. He attended the University of Illinois in Chicago from which he received the degree of Bachelor of Science in chemistry with honors in June, 1972, completing his undergraduate work after he had matriculated in the College of Medicine at the University of Illinois in September, 1971.

The first year of medical school (1971–72) was anything but a success for all three of the plaintiffs. Each testified before the College Committee that he was overwhelmed by the method of instruction and volume of work. McDonald continued to work on a non-medically oriented job. Marshall was divorced by his wife. Sullivan, in addition to his medical school studies, completed his undergraduate work in chemistry. In June, 1972 each failed the freshman comprehensive examination— a four-session, 500-question, multiple-choice, computer-graded examination in all essential respects similar to the one given in 1973, which is here in issue: McDonald scored 29, Marshall 40, and Sullivan 39 on a scale of 100.

The College of Medicine offered a tutorial course in the summer of 1972 for those students who had failed the June freshman comprehensive examination, and then allowed those students to retake the identical examination in Sep-

tember, 1972. None of the plaintiffs took the tutorial course. Marshall started it, but dropped out because the level of enquiry by the students was too basic. When each plaintiff took the September, 1972 repeat examination, he again failed: McDonald scored 38, Marshall 42 and Sullivan 44.

Plaintiffs were then granted the opportunity to repeat their freshman year, which they did. They organized a study group consisting of themselves and two other repeating students. The latter dropped out shortly into the school year. McDonald, Marshall and Sullivan persisted. They changed their study methods from regular class attendance, which they had pursued during 1971–72, to review of their own notes previously taken, review of the notes of other students, discussions based upon individually assigned topics in which one of them was assigned the role of discussion leader, consultations with faculty members when they encountered particular difficulty, and attendance at a two-week review session offered to first-year medical students enrolled at the College of Medicine on the Urbana campus. The evidence was uncontradicted that only McDonald, Marshall and Sullivan from the Chicago freshman group attended the Urbana review.

During the course of the repeat year, the three plaintiffs took approximately 10 short quiz-type examinations in which they averaged: McDonald 58, Marshall 65 and Sullivan 76. Also during the repeat year, they took diagnostic examinations in December and March which were similar in nature (although not as extensive) to the freshman comprehensive examination. On the diagnostic examinations McDonald's scores were 73 and 92; Marshall's were 81 and 86, and Sullivan's 87 and 94.

In June, 1973 the plaintiffs again took the freshman comprehensive examination. While the questions were different the content was essentially the same as the examination they had taken in June, 1972. McDonald scored 82, Marshall 87 and Sullivan 94. The highest score recorded by any other student was 83.

Four days after taking the June, 1973 freshman comprehensive examination, all three plaintiffs took the national board examination which covered essentially the same subject matters as the freshman comprehensive examination. The national board examination is, however, more intensive: there are 1000 questions on it compared to 500 on the comprehensive and the student is expected to complete it in approximately the same amount of time as the comprehensive. McDonald and Marshall failed the national board with scores of 250; Sullivan received the minimum passing score of 380.

As a result of a regular post-examination analysis of the freshman comprehensive examination, the Student Appraisal Committee of the College of Medicine became aware of the plaintiffs' outstanding performance on the comprehensive and that their performances were not consistent with their past or contemporaneous performances. Further investigation led the Appraisal Committee to conclude that there was cause to believe that plaintiffs had cheated on the comprehensive. Accordingly, charges of cheating were made by the Executive Dean and referred to the College Committee for hearings.

The College Committee held extensive evidentiary hearings which lasted six sessions. The resulting transcript is 825 pages long. The plaintiffs were represented at each session by able counsel of their choice. The plaintiffs and their counsel were permitted to cross-examine the witnesses called in support of the charges. Each plaintiff testified in his own behalf and denied that he had cheated. There was no testimony that anyone had observed plaintiffs conduct themselves during the highly-monitored examination in a way which would suggest that they were engaged in cheating, e. g., consulting unauthorized materials, looking at another student's paper, leaving the room, etc. Nevertheless, on the basis of circumstances adduced at the

hearing, the College Committee concluded that the plaintiffs had cheated with the resulting recommendations of expulsion previously described. Evidently the College Committee concluded that the plaintiffs had obtained access to the examination or the answer key or both prior to taking the examination and had either memorized the answers or taken them into the examination on some form of "crib." There was, however, no evidence of unauthorized possession or copying of the answer key or examination and reasonable security measures had been taken in respect to them.

The data considered by the Committee fell into two categories. The first consisted of the plaintiffs' prior and contemporaneous individual performances. McDonald had scored 29 and 38 on his freshman comprehensive test in June, 1971 and the repeat in September, and then scored 82; Marshall's history was 40, 42 and 87; Sullivan's 39, 44 and 94. Their national board scores, as a result of the test they took four days after the freshman comprehensive examination, were McDonald 250, Marshall 250 and Sullivan 380. However, according to testimony adduced at the hearing, had they scored on the national board consistent with their performances on the freshman comprehensive examination, they would have scored 662, 719 and 799 respectively. Conversely, had they scored on the freshman comprehensive examination consistent with their national board scores, they would have scored 52, 52 and 59 respectively.

All three plaintiffs, together with all pre-medical students, had taken the medical college aptitude test. While the testimony was that the aptitude test scores are not infallible predictors of medical school performance, they are a reasonably good predictor of first-year achievement. Each plaintiff had among the lowest aptitude scores in their class.

Each plaintiff was also compared with twelve other of their classmates who also repeated the freshman year. Their performance far exceeded that of all other repeaters. When compared with those of their classmates who wrote both the freshman comprehensive examination and the national board, plaintiffs' performances did not correlate. Thus, the student, other than plaintiffs, who performed best on the freshman comprehensive examination with a score of 83, scored 660 on the national board. McDonald, who scored 82 on the freshman comprehensive examination scored only 250 on the national board, Marshall scored 87 as against 250 and Sullivan 94 as against 380.

Prior freshman results on the comprehensive showed that in the previous five years no student had scored over 83. In one examination Marshall and Sullivan scored 87 and 94 respectively.

Each of these comparisons, standing alone, might be laid off to coincidence. But they were assembled in graphic exhibits and testimony which tended to show that all other students and subgroups of students who took the freshman comprehensive examination performed in a manner consistent with available comparison data while plaintiffs' individual performances were inconsistent with the available data.

The second category of data which the Committee considered consisted of circumstances internal to the plaintiffs' own performances on the freshman comprehensive examination.

The answer key which was drawn up before the examination was given and which was originally used for the computer scoring of the exam, inadvertently contained three wrong answers which were corrected after the examination was given. Each plaintiff marked the original wrong answer in two out of the three questions to which they related. The examination consisted of subtests (i. e., each covering a different medical discipline). On two of the subtests Sullivan scored 100 on the original scoring, only to miss one item in each subtest when the wrong answers were corrected.

Pursuant to a regular post-examination procedure, the freshman comprehensive examination was reviewed by the

faculty in light of the answer patterns of all of the students who took the examination. Twenty-eight questions were so ambiguous in their phraseology or in the phraseology of their respective answers as to be defective. These 28 items were taken out of the test and all papers were rescored without regard to them. Ten of the faulty items were on the behavioral science subtest. Marshall and Sullivan answered "correctly" (i. e., in accord with the original key) all of the defective behavioral science questions. Of the total 28 defective questions, Marshall missed only 5, Sullivan 2 and McDonald 8. McDonald's answer sheet originally had all 8 marked "correctly" but those answers were erased and changed to "incorrect" answers.

The post examination review revealed that the behavioral science subtest was particularly poorly drawn. It consisted of 23 items, 10 of which were identified as faulty and rejected prior to rescoring. The only students to pass the subtest as originally scored were McDonald, Marshall and Sullivan who scored 87, 100 and 100 respectively. Marshall and Sullivan answered all of the defective questions correctly according to the original key. The next highest freshman score was 61. The class average without plaintiffs' scores was 36. The remaining 9 students who scored over 80 on the entire freshman comprehensive examination averaged 41 on this subtest.

Sullivan scored 99% on the first 438 items of the 500-item freshman comprehensive examination. Out of the last 62 items, he missed 25. This grouping of wrong answers at the end of the examination was unique to Sullivan and it bore no relationship to the difficulty of the questions.

McDonald also had an unusual pattern of wrong answers. Altogether he missed 85 items. On 73 occasions, however, he first marked correct answers only to erase them and change them to incorrect answers. No other student had comparable changes either in number or in nature.

Each plaintiff testified in his own behalf and denied cheating on the examination. They testified to personal problems and distractions in their first year as medical students which were not present when they repeated that work. They were critical of their initial study habits. They attributed their success to their group study efforts, their increased familiarity with the method of examination employed in the College and their attendance at the two-week review session in Urbana. They offered no testimony in contradiction of the examination score data or the analysis thereof.[3] They did, however, urge that their diagnostic examination scores in December and March reflected an ability on their part to perform at the level of their comprehensive scores.[4]

At the conclusion of the six-day hearing, the Committee concluded:

". . . that the internal evidence relative to the correspondence of these students' answers to the initial key in ambiguous or improperly coded questions, relative to erasures in the case of McDonald, and relative to inter-section disparity in the case of Sullivan, together with the external evidence of response patterns of all three students as compared to their prior and con-

3. But see, footnote 5, infra, and accompanying text.

4. On the diagnostic examinations McDonald scored 73 and 92; Marshall 81 and 86, Sullivan 87 and 94. The College Committee discounted these performances because testing "personnel suspected that these students might have had the key to these two examinations, but did not feel at that time that there was sufficient evidence to press charges." Exhibit C, p. 2, to affidavit of James Martin, supra. That cryptic disposition of this evidence favorable to the plaintiffs is disturbing. A review of the testimony reveals, however, that answer keys for the diagnostic examinations were prepared in advance of the taking of these examinations. In contrast, on the short quiz-type examinations, given throughout the year, and for which no answer key was prepared in advance, McDonald averaged 58, Marshall 65 and Sullivan 76.

comitant performance on other tests and compared with other groups of concurrent students were strongly incriminating. Chance alone was seen to be an extremely unlikely explanation. The alternative explanation to cheating would be that the students' unique approach to study was much more effective than that of their fellow students. The Committee members did not consider this to be a reasonable explanation of the facts, particularly in light of the caliber of and known intensive and effective study habits of many of the other students with whom they were being compared, and because of these students' poor performance to mediocre performance on other concomitant tests."

The Committee then found that Mc-Donald, Marshall and Sullivan had "cheated on the Freshman Comprehensive Examination of June 20, 1973." Following their appeals they were expelled and these actions followed.

The gravamen of plaintiffs' complaints is that the finding that each of them cheated on the freshman comprehensive examination is "not supported by any substantial evidence." (Paragraph 15 of each complaint.) Other allegations that the College Committee was biased and its decision arbitrary, unreasonable and capricious were, in effect, withdrawn at the hearing on plaintiffs' motion for preliminary injunctions. That is to say, counsel for plaintiffs acknowledged that those are not allegations to be taken separate from the basic assertion of the insufficiency of the evidence upon which the Committee relied in arriving at its decision.

Plaintiffs did submit the testimonial affidavits of Dr. David Wiley and Dr. Norman D. Bowers in support of their motions for preliminary injunctions which are critical of the comparison of plaintiffs' test scores with the scores achieved by other first-year students on concomitant tests. The court granted plaintiffs leave to file the affidavits but refused to consider their content. Plaintiffs concede that they are not entitled to a trial de novo here. Plaintiffs were afforded a full opportunity to adduce testimony before the College Committee. In these circumstances the court has concluded that fresh evidence should not be received here and that review of the expulsion proceedings should be confined to the record made before the College Committee.[5]

There is a sharp disagreement between the plaintiffs and the defendants as to the scope or depth of review. The plaintiffs contend that the findings of the College Committee do not meet the due process requirements of the Fourteenth Amendment because they are not supported by "substantial" evidence. Defendants, on the other hand, while not conceding that the findings lack the support of substantial evidence, maintain that they must be sustained because they are supported by "some" evidence which defendants assert is the proper standard of review under the due process clause.

■ To the extent that the Supreme Court has reviewed findings within the context of the due process clause, its decisions support the defendants' position. In United States ex rel. Vajtauer v. Commissioner of Immigration, 273 U.S. 103, 47 S.Ct. 302, 71 L.Ed. 560 (1927), the Court considered in a habeas corpus proceeding the validity of an order of deportation. In affirming the denial of relief, the Court said (at 106, 47 S.Ct. at 304):

> "Deportation without a fair hearing on charges unsupported by any evidence is a denial of due process which may be corrected on habeas corpus . . . but a want of due process is not established by showing merely that the decision is erroneous . . . or that incompetent evidence

5. As noted in footnote 2, supra, complaint was also made that the Senate Committee refused to allow argument, briefs or receive fresh evidence. The complaint is insubstantial.

was received and considered . . . . Upon a collateral review in habeas corpus proceedings, it is sufficient that there was some evidence from which the conclusion of the administrative tribunal could be deduced and that it committed no errors so flagrant as to convince a court of the essential unfairness of the trial . . . .

"The ultimate question presented by this record, therefore, . . . is whether the warrant of deportation was supported by any evidence. . . ."

In Thompson v. City of Louisville et al., 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960), the Court reviewed and reversed defendant's state conviction of loitering and disorderly conduct. Due process was the standard of review. The Court concluded (at 206, 80 S.Ct. at 629):

". . . we find no evidence whatever in the record to support these convictions. Just as 'Conviction upon a charge not made would be sheer denial of due process,' so is it a violation of due process to convict and punish a man without evidence of his guilt."

Then in International Brotherhood, etc. v. Hardeman, 401 U.S. 233, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971), the Court addressed a similar question within the context of a collateral attack upon the expulsion of a union member in light of the requirements of Section 101(a)(5)(C) of the Labor-Management Reporting and Disclosure Act which guarantees union members a "full and fair" disciplinary hearing. In concluding that the order of expulsion was adequately supported by the evidence, the Court said (at 246-247, 91 S.Ct. at 617):

". . . the parties and the lower federal courts are in full agreement that this guarantee requires the charging party to provide some evidence at the disciplinary hearing to support the charges made. This is the proper standard of judicial review. We have repeatedly held that conviction on charges unsupported by any

evidence is a denial of due process, Thompson v. Louisville, 362 U.S. 199, 206, 80 S.Ct. 624, 629, 4 L.Ed.2d 654 (1960); Schware v. Board of Bar Examiners, 353 U.S. 232, 246-247, 77 S. Ct. 752, 760-761, 1 L.Ed.2d 796 (1957); Vajtauer v. Commissioner of Immigration, 273 U.S. 103, 106, 47 S. Ct. 302, 304, 71 L.Ed. 560 (1927); Tisi v. Tod, 264 U.S. 131, 133-134, 44 S.Ct. 260, 261, 68 L.Ed. 590 (1924); and we feel that § 101(a)(5)(C) may fairly be said to import a similar requirement into union disciplinary proceedings . . . A stricter standard . . . would require courts to judge the credibility of witnesses on the basis of what would be at best a cold record."

▬ The substantial evidence test contended for by the plaintiffs does not have its origin in the due process clauses of either the Fifth or Fourteenth Amendments. As applied in the federal courts, it is the standard for direct judicial review of administrative decisions coming to the courts under either the Administrative Procedure Act or the explicit provisions of the statutes creating administrative agencies whose decisions are subject to judicial review. Its history and content were discussed at length by the Supreme Court in Universal Camera Corp. v. Labor Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1950). Substantial evidence is more than a scintilla. It is akin to that quantum of proof which would oblige a judge to refuse to direct a verdict when the conclusion sought to be drawn is one of fact for a jury. While it differs from the "weight of evidence" or "clearly erroneous" standards frequently applied by appellate courts in their review of trial court determinations of fact, like them it contemplates review for correctness. As such it probes deeper into the record than does a review for fairness which is the essence of a due process inquiry.

Plaintiffs present a number of authorities which have stated that the substantial evidence test is the standard by which college disciplinary findings

should be collaterally reviewed in civil rights actions brought pursuant to 42 U.S.C. § 1983. Sill v. Pennsylvania State University, 318 F.Supp. 608 (M. D.Pa.1970), aff'd, 462 F.2d 463 (3d Cir. 1972); Speake v. Grantham, 317 F. Supp. 1253 (S.D.Miss.1970), aff'd, 440 F.2d 1351 (5th Cir. 1971); are representative. An analysis of these decisions reveals, however, that their starting point has frequently been the General Order on Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax Supported Institutions of Higher Education issued by the United States District Court for the Western District of Missouri, sitting en banc, 45 F.R.D. 133 (1968). In what was in essence an advisory opinion, the court stated that "no disciplinary action [can] be taken on grounds which are not supported by any substantial evidence."[6] In support of this statement, the judges of the Western District of Missouri cited Thompson v. City of Louisville, *supra*. Thus, while the language of the General Order and ensuing decisions is "substantial evidence" the bedrock authority emerges as the "some evidence" due process standard of *Thompson*. See, also, C. Wright, The Constitution on the Campus, 22 Vand.L.R. 1027, 1059 (1969).

Furthermore, in virtually all of the cases relied upon by these plaintiffs, the plaintiff students alleged that they had been disciplined by state university authorities for conduct protected by the First Amendment. The university authorities responded that the student's conduct had gone beyond the scope of the First Amendment. The overall student conduct—generally a meeting or rally called to express a grievance—was entitled to First Amendment protection. In such circumstances a federal court arguably should require that there be substantial evidence that the conduct of

a particular student had exceeded the scope of First Amendment protection before that student could be disciplined. Such a standard, however, would be imposed to protect against an infringment of the First Amendment, not as a general due process standard.

The instant cases do not fit within that hypothesis. These plaintiffs have not been disciplined for conduct arguably falling within the scope of any Constitutional protection. Their offense was unique to the academic community. The charges against them were heard by a tribunal composed of teachers and fellow students, peculiarly suited to hear the charges and weigh the evidence submitted in support of them. While plaintiffs were entitled to a full and fair hearing before a sanction so severe as expulsion from medical school could be imposed against them, they are not entitled to a federal court collateral review of that hearing more penetrating than that required by the due process clause of the Fourteenth Amendment.

■■ When the record of proceedings before the College Committee is reviewed by that standard, it is clear that each plaintiff was accorded due process of law under the Fourteenth Amendment. Each plaintiff received a full and fair hearing on the charges made against him. Each was represented by Counsel of his choice. Each was afforded the opportunity to confront and cross-examine the witnesses against him and to testify (and adduce other evidence) in his own behalf. The findings of the College Committee were not arbitrarily and capriciously rendered; they are supported by the evidence.

A federal court reviewing this record under the Fourteenth Amendment and the Civil Rights Act is not free to substitute its judgment for that of the primary fact finders. Nor may it probe to

---

**6.** The expression "any substantial evidence" is ambiguous. Plaintiffs have adopted it in their complaints. Each alleges, in paragraph 15, that the findings of the College Committee are "not supported by any substantial evidence." "Some evidence" or "any evidence" is one test; "substantial evidence" is another. The two are quite different.

determine if the findings are supported by substantial evidence. While a state court sitting in review of its own state's educational institutions might fashion such a standard of review, a federal court, by reason of its limited jurisdiction, is confined to determining whether the challenged proceedings meet the minimal standards of due process of law. Clearly the proceedings of which plaintiffs complain meet those standards.

Accordingly, plaintiffs' motions for preliminary injunctions will be denied. Defendants' motions for summary judgment will be granted. Judgments will enter dismissing plaintiffs' actions.