In the

# United States Court of Appeals
## For the Seventh Circuit

No. 16-1064

NICHOLAS HESS,

*Plaintiff-Appellant*,

*v.*

THE BOARD OF TRUSTEES OF SOUTHERN
ILLINOIS UNIVERSITY, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:14-cv-00727 LJM — **Larry J. McKinney**, *Judge.*[*]

ARGUED SEPTEMBER 15, 2016 — DECIDED OCTOBER 13, 2016

Before FLAUM, MANION, and HAMILTON, *Circuit Judges*.

FLAUM, *Circuit Judge*. Nicholas Hess was suspended and
later expelled from Southern Illinois University (SIU) after he
was arrested for aggravated battery. Hess sued the Board of

[*] Of the Southern District of Indiana, sitting by designation.

Trustees of the university, as well as several school adminis-
trators in their individual and official capacities, for violations
of his procedural and substantive due-process rights. After
dismissing some of the claims as barred by sovereign immun-
ity, the district court awarded summary judgment to defend-
ants on the remaining claims. We affirm.

## I. Background

In the early morning of November 28, 2013, law-enforce-
ment officials responded to a call about a bar fight in Marion,
Illinois. Marion police officer Adam Byrne was one of the first
to arrive at the scene. As he approached the bar, Byrne spotted
one man chasing another across the parking lot. The latter in-
dividual ran to a parked car and was able to get in before the
pursuer, not far behind, also reached the car and began
punching at the driver's-side window. Byrne restrained the
pursuer, and the man in the car drove away.

The pursuer was Nicholas Hess, a student at SIU. Hess
told Officer Byrne that a fight had broken out at the bar, so he
and his brother, sister, and girlfriend had tried to leave the
venue. Before they could do so, however, a man Hess recog-
nized as Aaron Franks had hit Hess's sister in the face. Hess
had then given chase, but claimed to have never made contact
with Franks because Franks had jumped into his car. Hess's
girlfriend and his siblings corroborated his story, though the
sister did not have any injuries suggestive of facial trauma.

The Marion Police Department sent an officer to speak
with Aaron Franks, who had driven himself to a nearby hos-
pital. Franks, it turned out, had been stabbed several times,
and he gave to the police officer a physical description of the
person Franks believed had attacked him. This description

closely matched Hess's appearance on the morning in question, and Hess was taken into custody a short time later. After a second round of questioning—during which Hess gave the same account as he had previously—Hess was released. A few days later, however, he was charged with aggravated battery, and a warrant was issued for his arrest on December 4, 2013. Hess turned himself in on December 9, and was released on bail later that day.

News of the arrest soon reached SIU's Director of Student Rights and Responsibilities, Chad Trisler, who requested the relevant incident reports from the police department. After reviewing the reports, Trisler recommended to the acting Dean of Students, Katherine Sermersheim, that Hess be suspended from the university pending a hearing. Sermersheim concurred, and asked Trisler to issue the interim suspension.

On December 11, 2013, SIU police officers told Hess to come to the campus police department to receive a letter. Hess went to the department with his mother, and Trisler met with them and explained that Hess was being suspended. Trisler also gave to Hess a written notice of suspension, which stated that Hess was being suspended from all university property and events in light of allegations from the Williamson County Sheriff's Department that he had stabbed someone several times during a bar fight. If Hess wished to appeal the suspension, the notice explained, he could ask for an interim appeal hearing, which would take place within two days of the request. Hess did not request an interim hearing, and, while suspended, he missed two final exams.

On December 13, Hess received from Trisler a "charge and notification" letter, which listed the provisions of the SIU Student Conduct Code that school administrators believed Hess

had violated during the bar incident. These alleged violations included: (1) intentional, negligent, or attempted homicide; (2) physical assault or abuse; (3) violent behavior; (4) "group actions" (defined in Section 2.3.6.2 of the Code as any incident in which a group of two or more persons engaged in violence, or the threat of violence, against an individual); (5) reckless disregard for the risk one's actions presented to others; (6) reckless conduct presenting a danger to property; (7) the possession, carrying, or use of any object intended for use as, or used as, a weapon; and (8) disorderly conduct. The letter instructed Hess to complete and return to SIU within five days an attached form, in which Hess could either admit his responsibility for the offenses charged, or deny his responsibility and request an administrative hearing. Hess requested a hearing, which was scheduled (in light of the winter holiday) for January 17, 2014.

Four days before the January hearing, Hess received a letter explaining that Chad Trisler would be his assigned hearing officer, and that Hess could call as a witness any person who had been present at, or who otherwise had firsthand knowledge of, the events at issue. Hess decided to testify on his own behalf, but had little to say at the hearing, as his counsel—who was present as Hess's advisor throughout the proceeding—had instructed him not to answer any questions about what had happened at the bar. Hess's girlfriend testified that she, Hess, and his siblings had decided to leave the bar after another person had told them that someone there had a gun. It was in trying to exit that Hess had seen Aaron Franks (the stabbing victim) punch Hess's sister in the nose, and Hess had given chase. Up until that point, said the girlfriend, she and Hess had been holding hands.

Officer Byrne also testified at the hearing. He described what he had seen after arriving at the bar—*i.e.*, Hess chasing Franks across the parking lot—and what Hess (and, later, his girlfriend and siblings) had told Officer Byrne about Franks punching Hess's sister in the face. Byrne had then gone inside the bar to investigate, he explained, and had concluded that several "incidents of battery" had taken place there—though he did not believe Hess had participated in those fights.[1] Byrne testified that Franks had later described his attacker as resembling Hess, and that police officers had looked for evidence that Hess had had with him at the bar a knife or other weapon, but that no such evidence was found.

Trisler nonetheless thought Franks's description was credible, and concluded that Hess was responsible for the stabbing. In a letter dated January 21, 2014, Trisler informed Hess of the decision to expel him from the university. The letter enumerated the seven sections of the Student Conduct Code that Trisler believed Hess had violated—oddly, only "use of a weapon" was dropped from the original list of eight alleged violations—and explained that Hess had three days in which to file an administrative appeal. Hess did so, and his appeal was considered by a three-member panel of SIU employees.

---

[1] According to Byrne's written police report, he had seen inside the bar Aaron Franks's brother, Aadam, and two men with blood on them, Mikeal Simmons and Dustin Kendrick. Aadam claimed to have been injured by Simmons, and Simmons by Aadam, after Simmons had exchanged angry words with Aaron Franks. Kendrick maintained that he had been punched in the face—though he did not say by whom—when attempting to break up a fight between his friends and another man, who had attacked them.

The panel recommended that Trisler's decision be upheld, and the Chancellor of the university, Rita Cheng, agreed.

Hess filed suit under 42 U.S.C. § 1983 against SIU's Board of Trustees, and Cheng, Sermersheim, and Trisler—each in their individual and official capacities—for violations of Hess's procedural and substantive due-process rights. According to Hess, he had a property interest in a continued education at SIU, as well as a liberty interest in his reputation with his instructors and fellow students (and in his ability to pursue additional education elsewhere), and defendants had unlawfully deprived him of those interests by: (1) suspending him without first affording him an opportunity to tell his side of the story; and (2) expelling him after conducting an unfair hearing. Hess requested money damages, as well as an injunction compelling both his readmission to the university and the opportunity for Hess to take his missed final exams.

Defendants filed a motion to dismiss the complaint, arguing first that the official-capacity claims and claims against the Board for monetary relief were barred by the Eleventh Amendment, and, second, that the claims as a whole were inadequately pleaded. The motion to dismiss was still pending when the parties later cross-moved for summary judgment, so the district court resolved all three motions in the same opinion.

The court granted the motion to dismiss insofar as it concerned the damages claims against the Board, and against the administrators as sued in their official capacities, as these were claims against the university. The university, reasoned the court, was not a "person" from whom money damages could be obtained under § 1983. The court then converted the

remainder of the motion to dismiss into a motion for summary judgment, and ruled, in connection with the existing motions for summary judgment, in defendants' favor. Hess had established neither a protected property interest nor a protected liberty interest, said the court; and even if he had proven such an interest, defendants had in any event provided Hess with sufficient procedural protections in depriving him of it. The district court was similarly unconvinced of any substantive due-process violation.

Hess now appeals the granting of defendants' summary-judgment motion. He does not challenge either the denial of his own summary-judgment motion or the court's dismissal of his money-damages claims against the university.

## II. Discussion

We review de novo a district court's decision on cross-motions for summary judgment, construing all facts and drawing all reasonable inferences in favor of the party against whom the motion under consideration was filed. *Calumet River Fleeting, Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL–CIO*, 824 F.3d 645, 647–48 (7th Cir. 2016) (citations omitted). As we consider here only defendants' motion for summary judgment, we resolve all factual disputes in Hess's favor. Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

### A. Procedural Due Process

We undertake a two-part analysis in procedural due-process cases: first, we determine whether the plaintiff was deprived of a protected interest; if so, we determine what process was due under the circumstances. *See Charleston v. Bd. of*

*Trs. of the Univ. of Ill. at Chi.*, 741 F.3d 769, 772 (7th Cir. 2013) (citing *Omosegbon v. Wells*, 335 F.3d 668, 674 (7th Cir. 2003)); *Pugel v. Bd. of Trs. of the Univ. of Ill.*, 378 F.3d 659, 662 (7th Cir. 2004) (citing *Doherty v. City of Chi.*, 75 F.3d 318, 322 (7th Cir. 1996)). Hess argues that he had a protected interest in, among other things, a continued education at SIU—both at the time of his interim suspension, and, later, when Hess was permanently expelled from campus. We will assume for present purposes that Hess did have such an interest, and that defendants therefore deprived him of this interest in removing Hess from school. We turn, then, to the procedures used by the university in effecting that alleged deprivation.

Where students are suspended from school for only brief periods of time—*i.e.*, for ten days or fewer—due process requires only minimal safeguards: notice of the charges asserted against the student, and, if he denies them, an explanation of the evidence and an opportunity for the student to present his side of the story. *See Goss v. Lopez*, 419 U.S. 565, 581 (1975); *see also id.* at 584 (discussing an "informal give-and-take" between the student and disciplinarian). Hess was suspended for more than ten days, but the temporary exclusion from school property and activities was, as a practical matter, much shorter than the calendar would otherwise suggest, as the suspension coincided with SIU's winter break. The *Goss* standard thus applies here. Hess does not quarrel with the application of this standard to his interim suspension, but maintains that the standard was not satisfied in this case because there was no "give-and-take" *before* the punishment was imposed. *See* 419 U.S. at 582 (noting that, in general, the required notice and hearing should precede the student's removal from school). Hess was merely given a letter describing the conduct of which he had been accused.

As we have explained in the past, however, schools may in some instances dispense with certain pre-disciplinary procedures without running afoul of the Due Process Clause. In *Medlock v. Trustees of Indiana University*, 738 F.3d 867 (7th Cir. 2013), for example, we addressed the suspension of a college student found to have cultivated and hidden in his dorm room a large quantity of marijuana. This flagrant violation of university rules—and of Indiana criminal law—in our view warranted immediate remedial action, and therefore obviated the need for a pre-suspension hearing. *See id.* at 871 (citing *Goss*, 419 U.S. at 581–83). There are, as Hess points out, differences between *Medlock* and the present case: Whereas in *Medlock* all evidence pointed toward the student's guilt, leaving no doubt that he had engaged in the conduct charged, *see id.* at 871–72, here, as we shall see, the balance does not tilt so clearly in the university's favor. Nevertheless, an arrest warrant for aggravated battery was compelling evidence that Hess may have been responsible for the stabbing of Aaron Franks—permitting SIU, in the interest of protecting other members of its community, to promptly remove Hess from campus pending a later hearing. *See Goss*, 419 U.S. at 582–83 (observing that schools may provide a *post*-removal hearing where, as here, the student's presence "poses a continuing danger to persons or property").

Hess insists that he was not a threat to anyone at SIU, and that defendants could not reasonably have believed that he was, because the person Hess had allegedly injured was not a student at the university. Hess had also been on campus multiple times between the stabbing incident and when he was suspended, and on none of those occasions had he behaved violently toward anyone. Moreover, says Hess, the school had

no policy of prohibiting convicted persons from entering uni-
versity property—so it made no sense to bar from campus
those who had been merely accused, but not convicted, of
committing a crime. None of these arguments is persuasive.
Whether SIU had formally banned all convicted felons from
coming onto campus says nothing about the actions school
administrators could, or would, take when faced with a par-
ticularized threat; and, as evidenced by the warrant for Hess's
arrest, administrators in this case had reason to be concerned.
The police believed Hess had stabbed another person multi-
ple times—thus suggesting to defendants that Hess was not
in full command of his emotions or, consequently, his behav-
ior, and might without warning endanger other individuals.
That Aaron Franks was not a member of the SIU community,
or that Hess had returned to campus without issue since the
stabbing had occurred, would not have obviated the risk de-
fendants reasonably thought Hess's presence posed. It was
logical for the university to suspend him pending a later hear-
ing. *Cf. Gilbert v. Homar*, 520 U.S. 924, 933–34 (1997) (conclud-
ing, in the public-employment context, that a pre-suspension
hearing was rendered unnecessary by an arrest and the filing
of charges, as these events ensured that there were reasonable
grounds for disciplinary action) (citation omitted).[2]

---

[2] Hess cites to *Goss* for the proposition that even his arrest was not
reason enough to do away with a pre-disciplinary hearing, as one of the
students in *Goss* had likewise been arrested, and due process required for
that student a pre-deprivation opportunity to explain herself. *See* 419 U.S.
at 580 n.9. However, the problem with the procedures afforded in *Goss*
was not the lack of a pre-suspension hearing in particular, but the failure
to provide a disciplinary hearing at *any* time. *See id.*; *id.* at 571, 584. Indeed,
and as noted above, the Supreme Court was careful to explain that the
kind of pre-disciplinary procedures Hess now demands are not required

Moreover, we question the degree to which Hess actually valued the interest he says was curtailed by the interim suspension—and thus the importance to Hess of any pre-disciplinary safeguards he claims ought to have been employed here—as Hess chose not to appeal that suspension in the first instance. *See, e.g.*, *Goss*, 419 U.S. at 578 (noting that procedural due process is a practical concept, dependent on context) (citation omitted); *id.* at 579 (examining, in context, the private interest at stake); *Pugel*, 378 F.3d at 663–64 (same). The written notice of disciplinary action that Hess received on December 11, 2013, explained that Hess could request an interim appeal meeting; and that meeting, had Hess asked for one, would have taken place within two days of the request. So Hess could have had his say by December 13. Hess urges that a conversation at that time would have served no purpose, because he still would have missed his final exams. Yet even if an interim appeal would not have allowed Hess to take all of his exams as scheduled, we do not see why a student in his position, as concerned with his academic record as Hess claims to have been, would not have availed himself of every opportunity to protect—or at least mitigate the possible damage to—that record.

In any event, Hess argues that the hearing he ultimately did receive—that is, the post-suspension (but pre-expulsion) hearing—was procedurally deficient, because the presiding officer, Chad Trisler, was biased against Hess and had pre-

---

in situations where, as here, the student's presence potentially poses a continuing danger to the school community. *See id.* at 582–83 (observing that, in such cases, the rudimentary hearing should take place "as soon as practicable").

judged his case. Trisler must have been biased, says Hess, because: Trisler was smiling when he first told Hess about the interim suspension in December 2013; Trisler purportedly communicated to the Dean of Students that, before the hearing in January 2014, Trisler had already decided Hess was guilty of the conduct charged; and Trisler not only presided over that hearing, but was also responsible for collecting the evidence presented during the proceeding.

Although biased decision-making does violate due process, *see Withrow v. Larkin*, 421 U.S. 35, 47 (1975), the combination of investigative and adjudicative functions into a single administrator does not, in itself, demonstrate such bias, *see id.* at 47–55. This is because we presume that administrators are honest and impartial, *id.* at 47, and therefore "capable of judging a particular controversy fairly on the basis of its own circumstances," *id.* at 55 (quoting *United States v. Morgan*, 313 U.S. 409, 421 (1941)). The presumption is a rebuttable one, but the burden of rebuttal is heavy indeed: To carry that burden, the party claiming bias must lay a specific foundation of prejudice or prejudgment, such that the probability of actual bias is too high to be constitutionally tolerable. *Id.* at 47, 55; *see also Amundsen v. Chi. Park Dist.*, 218 F.3d 712, 716 (7th Cir. 2000) (explaining that the plaintiff typically must show that the adjudicator had a pecuniary interest in the outcome of the case, or that he was previously the target of the plaintiff's personal abuse or criticism (quoting *Withrow*, 421 U.S. at 47)).[3]

---

[3] Before the district court, Hess argued that Trisler was likely biased against him because of some offensive remarks Hess (and his mother) allegedly made to Trisler after learning of the suspension. The district court rejected this argument, however, and Hess has not renewed it on appeal.

To show prejudgment here, Hess relies in part on the deposition testimony of Dean Sermersheim—which, according to Hess, demonstrates that Trisler thought him guilty from the get-go. Sermersheim testified as follows:

Q: What was your understanding of what the charges were that had been lodged against Hess on December 11, 2013?

A: The information I had at the time was a bar fight, resulting in Mr. Hess stabbing another individual multiple times.

Q: Did you conclude that Hess had stabbed another individual multiple times?

A: At that time, based on the information we had, yes.

Q: Really?

A: Yes.

Q: You had concluded that Hess had stabbed another individual multiple times, correct?

A: Yes.

Q: Who told you that, that Hess had stabbed another individual multiple times?

A: That was the information that we had at that time shared with me by Chad Trisler.

Q: Well, "we." Who is "we"?

A: Chad, uh, the information that was shared with him, which in turn, following our policy, when we believe there's information to

suggest a threat to the university commu-
nity, uh —

Q: But my question is, did Chad Trisler tell you
that he believed that Hess had stabbed an-
other individual multiple times?

A: Yes. Based on not him believing, but based
on information that we had received
through our community partners, uh, the in-
formation was shared that that is what was
believed to have occurred at that time.

Q: [S]o Chad Trisler told you that he had re-
viewed information that had been supplied
to him by your, quote, partners, which I take
it in this case was the Marion Police Depart-
ment, right?

A: I'm not exactly sure who the source was, but
it was police, law enforcement.

…

Q: And based on his review of that information,
he concluded, he told you that Hess had
stabbed another individual multiple times;
is that accurate?

…

A: Yes.

We agree with the district court that only a tortured reading
of these statements would permit an inference of predetermi-
nation on Trisler's part. Read sensibly and as a whole, the tes-
timony clearly communicates that it was the police, not Tris-
ler, who initially thought Hess responsible for the stabbing,

and that SIU administrators simply credited those beliefs in deciding whether to remove Hess temporarily from campus. Nothing in these statements indicates that Trisler had conclusively determined Hess's guilt before the January hearing.

This leaves us with Hess's assertion that Trisler was smiling when the latter informed Hess of his interim suspension in December 2013. Even if true, this evidence is insufficient to overcome the presumption of impartiality. Smiling at another's misfortune may reflect malice, as Hess urges; but one may also smile in sympathy, or to ease the tension of a difficult moment—or simply out of awkwardness. And there is no suggestion that Trisler's facial expressions here were in fact the product of bad faith. Trisler did not know Hess before their December 2013 meeting, and thus had no reason to dislike him. Nor is there any evidence that Trisler knew the stabbing victim. The alleged smile is not enough to show an unacceptable likelihood of bias on Trisler's part.

Moreover, even if Trisler had displayed bias, Hess was able to (and did) appeal that administrator's decision to another adjudicative body. Trisler's decision was considered—and upheld—by a three-member panel of university employees, and later by Cheng, the university Chancellor. While Hess implies that Cheng neglected to conduct an independent review of the facts, and so effectively rubber-stamped the recommendations she received, there is no evidence reasonably suggesting that this was the case. In any event, the decision to expel, as just noted, was also reviewed by the three-member appeals panel; and there is no contention that any of the latter individuals was biased against Hess. Thus, to the extent Hess's procedural due-process claim rests on allegations of bias, that claim suffers from a fatal flaw. *Cf. Schacht v. Wis.*

*Dep't of Corr.*, 175 F.3d 497, 503 (7th Cir. 1999) (no due-process violation where the plaintiff could still obtain administrative remedies from unbiased decision-makers), *overruled on other grounds by Higgins v. Mississippi*, 217 F.3d 951 (7th Cir. 2000).

"Due process does not … require a judicial or quasi-judicial trial … before a school may punish misconduct." *Coronado v. Valleyview Pub. Sch. Dist. 365-U*, 537 F.3d 791, 795 (7th Cir. 2008) (citations and internal quotation marks omitted). In addition to notice, the Constitution requires only that students facing expulsion receive a meaningful opportunity to be heard. *Id.*; *Remer v. Burlington Area Sch. Dist.*, 286 F.3d 1007, 1010 (7th Cir. 2002) (citing *Linwood v. Bd. of Educ.*, 463 F.2d 763, 769–70 (7th Cir. 1972)). Hess received exactly that. He had a hearing, at which he was permitted to call witnesses, question those witnesses, and testify on his own behalf; and he had counsel, present with him and advising him, throughout that proceeding. These procedural safeguards were constitutionally adequate.

## B. Substantive Due Process

Because there is no fundamental right to education, *see Charleston*, 741 F.3d at 774 (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35–37 (1973)), Hess's substantive due-process claim, like his procedural claim, rests on the alleged deprivation of an independent property or liberty interest, *see id.* (citing *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009)). We again suppose the existence of such an interest here, and ask instead whether the alleged deprivation of that interest was constitutionally problematic. To demonstrate a substantive due-process violation, Hess must show that the university's actions were so wholly arbitrary as to "shock[] the conscience." *Remer*, 286 F.3d at 1013 (quoting

*Dunn v. Fairfield Cmty. High Sch. Dist. No. 225*, 158 F.3d 962, 965 (7th Cir. 1998)); *see also id.* ("Only the most egregious official conduct is arbitrary in the constitutional sense." (quoting *Dunn*, 158 F.3d at 965)) (internal brackets and quotation marks omitted).

Hess argues that Trisler's conduct was egregious enough to shock the conscience, because there was no evidence that Hess had stabbed Aaron Franks. Thus, Hess contends, there was no evidence supporting Trisler's decision to expel Hess from SIU, as the lesser charges of disorderly conduct, etc., would not have warranted such an extreme (and, according to Trisler, rarely-used) sanction. It is true that not all of the available evidence pointed to Hess as Franks's attacker. Hess's girlfriend, for example, testified at the hearing that she had been holding Hess's hand before Hess had gone after Franks, and that the two men had "never made bodily contact." And Officer Byrne testified that he did not think Hess had been involved in the "incidents of battery" inside the bar. Byrne also stated that the police had uncovered no evidence that Hess had had a knife with him that morning.

Franks, however, had described his attacker, and that description—by Hess's own admission—closely matched Hess's appearance on the morning in question.[4] Hess argues that Trisler should not have given the description any weight, because Franks's credibility was never tested. And it was never tested, says Hess, because Franks was not called as a witness

---

[4] Hess complains that Trisler referred to Franks's description as an "identification," when in fact no line-up or other formal identification procedure was used. While a formal identification may have been *stronger* evidence of Hess's culpability, this does not mean that the description Franks did provide ought not to have been considered at all.

at the hearing—an omission Hess seeks to lay at the feet of the university. The criticism is misplaced. Trisler could have asked Franks to attend the hearing, but Hess could have done so, as well. Hess also could have asked Trisler to make the request on his behalf, as explained in Section 4.4 of SIU's Student Conduct Code. Hess did neither. And more importantly, at the hearing, Hess did not communicate any reasons he may have had for suspecting Franks was lying.[5] Trisler, meanwhile, had reason to be skeptical of Hess's story. According to Hess—as he explained to the police in November 2013 (and as reflected in the police report provided to SIU)—he had run after Franks because Franks had punched Hess's sister in the face. Yet the sister did not have on her face any markings indicating she had in fact been hit there, and she did not seek criminal charges against Franks until *after* her brother had been arrested for the stabbing (which was almost a week after the incident had taken place). Franks, moreover, was bleeding from multiple stab wounds when the attack on Hess's sister purportedly took place. Trisler thought it odd—and we cannot say he was wrong to so believe—that someone with Franks's injuries would act so aggressively toward a woman he did not know.

We do not say that all signs pointed to Hess as the person responsible for the stabbing. But there was enough evidence of Hess's culpability to preclude us from disturbing Trisler's assessment of guilt. *See McDonald v. Bd. of Trs. of Univ. of Ill.*, 375 F. Supp. 95, 102–03 (N.D. Ill. 1974) (explaining that a disciplinarian's findings must be sustained where supported by

---

[5] For example, Hess now suggests that Franks knew him, and so would have referred to him by name if Franks had actually intended to identify Hess as Franks's attacker.

"some," but not necessarily substantial, evidence), *aff'd and adopted by McDonald v. Bd. of Trs. of Univ. of Ill.*, 503 F.2d 105 (7th Cir. 1974). The Fourteenth Amendment is not a vehicle for re-litigating in federal court evidentiary questions arising in school disciplinary proceedings, or for correcting a university's allegedly bad decision-making. *See Wood v. Strickland*, 420 U.S. 308, 326 (1975); *Flint v. City of Belvidere*, 791 F.3d 764, 770 (7th Cir. 2015) (citations omitted). To succeed on his substantive due-process claim, Hess needed to show much more: He needed to show that defendants acted with a *mens rea* approaching that of criminal recklessness. *See Flint*, 791 F.3d at 770 (citations omitted). Even when viewing the facts in Hess's favor, no reasonable juror would find such recklessness here.[6]

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[6] Because there was no constitutional violation, we do not reach defendants' alternative argument that the individual administrators are qualifiedly immune from suit.