In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-3174

MAISHA I. HAMILTON,

*Plaintiff-Appellant*,

*v.*

VILLAGE OF OAK LAWN, ILLINOIS, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 3416 — **Blanche M. Manning**, *Judge*.

SUBMITTED AUGUST 29, 2013 — DECIDED NOVEMBER 20, 2013

Before POSNER, ROVNER, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*. Allan Lorincz, a man in his mid-80s retired from the University of Chicago Medical Center, where he had been a distinguished dermatologist, was dying of Parkinson's disease in the spring of 2010 when, according to the plaintiff, Maisha Hamilton, he hired her to help him in his home with various "end-of-life tasks." She was a friend of a wayward daughter of Lorincz. A defrocked physician, the daughter was, during the events giving rise to this law-

suit, serving jail time for criminal contempt.

After working 88 hours for Lorincz, Hamilton asked him for $5,720 in back wages ($65 an hour times 88 hours). In response to her request he gave her a check for $10,000, the $4,280 difference representing, according to her, a "bonus." Two other adult children of Lorincz were told, in a phone call surprisingly from Hamilton herself, that their father was dying and had just given her a $10,000 check. Knowing that Hamilton had a criminal conviction for fraud, they suspected that she'd extracted the check by preying on the weakness of their father's mind in his terminal state. On the basis of Hamilton's call, one of the children (Alice Dale) phoned the police and told the dispatcher who answered the phone that Hamilton was taking advantage of their desperately impaired father to obtain money to which she was not entitled. The other child (Donald Lorincz) went to their father's house.

Hamilton, who was at the house when the police arrived to investigate Alice's accusation, asked them to let her leave with her check. They told her she couldn't leave—with or without it. Although Lorincz told the police that he wanted Hamilton to have the $10,000 and wanted the police to leave, they remained for about two hours, trying to determine whether the children's accusation of elder abuse warranted arresting Hamilton or taking other measures. From the children and from Hamilton herself the police learned that she was not a home health care provider but a convicted fraudster. She had been a psychologist, but her license had been revoked after her felony conviction for a $435,000 Medicaid fraud. See *People v. Hamilton-Bennett*, No 02 CR 16455 (Cook County Circuit Court, Sept. 21, 2004). The police also learned

that Lorincz already had professional home health care aides when Hamilton had "rushed" to his side; that another person at the residence (Davy Cady) who was not a member of Lorincz's family had for unknown reasons been offered $5,000 by Lorincz; and that thinking Lorincz was on the verge of death Hamilton had summoned a notary public to witness him grant a power of attorney to her.

Although we're not certain that the police knew it at the time, Hamilton has a history of bizarre lawsuits against government officials. She had attempted to intervene as a plaintiff in the Justice Department's prosecution of Illinois Governor Blagojevich, arguing that in retaliation for her reporting 40 incidents of public corruption he had conspired to kidnap her and force her into involuntary servitude, had "destroyed Sankofa World, a $900 million 'edutainment' theme park that Hamilton was developing in the Florida panhandle," and had thwarted business ventures that she had negotiated with Daimler Chrysler, Lockheed Martin, and a Ghanaian exporter of honey. *United States v. Blagojevich*, No. 08 CR 888, ECF Dkt. No. 527 (N.D. Ill. July 27, 2010). She had also tried to remove a state perjury prosecution against her to federal district court on the ground that the prosecutors had conspired to kidnap and enslave her in order to suppress her testimony about corruption. *People v. Hamilton-Bennett*, No. 05 C 7169, ECF Dkt. No. 1 (N.D. Ill. Dec. 22, 2005). And she had sued the attorney general of Illinois, the governor of Virginia, and dozens of others alleging a conspiracy to enslave her by having caused her to be arrested for her Medicaid fraud. *Hamilton v. Madigan*, No. 10 C 6449, ECF Dkt. No. 1 (N.D. Ill. Oct. 7, 2010).

So the police had entered a house in which it appeared that two delusional persons (Davy Cady was the other, as the reader is about to discover) had sought large sums of money and a power of attorney from a dying old man in the absence of any members of the man's family. (Regarding Cady see, e.g., *Cady v. Sheahan*, 467 F.3d 1057, 1063 (7th Cir. 2006); *Cady v. Village of McCook*, 57 F. App'x 261, 263 (7th Cir. 2003) ("Cady denied to the district court that he was all wet and talking to himself, but conceded that he may have been perspiring heavily, may have doused himself with water to cool down, or may have been practicing a foreign language or singing a hymn"); *Cady v. Cook County*, No. 02 C 8333, 2003 WL 21360898, at *4 (N.D. Ill. June 11, 2003) (suit against the Cook County law library complaining among other horrors of "the Library's failure to provide a working heavy duty stapler with enough staples").) No wonder the police lingered for two hours, wondering what to do. Finally they decided not to arrest Hamilton but instead ordered her to leave the house, and she did—but without the $10,000 check, which the police forbade her to take.

Lorincz died four months after the police visit. Hamilton sued his estate, claiming that it owed her $74,610 in unpaid wages, including the $10,000 she hadn't gotten because the police hadn't let her take the check. *In re Estate of Allan Lorincz*, 10 P 6117 (Cook County Probate Division, Oct. 12, 2010). A month after losing that suit she filed the present one in federal district court under 42 U.S.C. § 1983, charging the police with violating her Fourth Amendment rights first by detaining her in the doctor's house and then by forcing her to leave it. Additional federal claims in her complaint—that Alice Dale and Donald Lorincz had conspired with the police to violate Hamilton's rights and that the Village that

employed the police officers was liable for their violations of her rights—fell with her Fourth Amendment charge against the police. *Sow v. Fortville Police Department*, 636 F.3d 293, 304–05 (7th Cir. 2011). The judge relinquished jurisdiction over her remaining claim, a state law claim of tortious interference with contract.

Detaining a person for two hours is too long to constitute a *Terry* stop, a type of police detention that is constitutionally permissible without need for probable cause to arrest. *United States v. Place*, 462 U.S. 696, 709–10 (1983); see also *United States v. Alpert*, 816 F.2d 958, 964 (4th Cir. 1987). By the end of the two hours, after talking to the children, to Lorincz's professional home helpers, and to Hamilton and Cady, the police had probable cause to arrest Hamilton. But we don't know at just what point in the two-hour investigation they acquired that probable cause. If what may have begun as a *Terry* stop became by passage of time an arrest before the police acquired probable cause, the arrest was unlawful. E.g., *Sibron v. New York*, 392 U.S. 40, 62–63 (1968); *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009). To base probable cause, justifying a lawful arrest, on information obtained from an illegal arrest would be bootstrapping.

But as we explained in *United States v. Chaidez*, 919 F.2d 1193, 1196–99 (7th Cir. 1990), not all lawful police detentions need be classifiable as either *Terry* stops or arrests. It is more faithful to the Fourth Amendment's requirement that searches and seizures be reasonable to hold that "stops too intrusive to be justified by suspicion under *Terry*, but short of custodial arrest, are reasonable when the degree of suspicion is adequate in light of the degree and duration of restraint." *Id*. at 1198; see also *United States v. Smith*, 3 F.3d

1088, 1095–96 (7th Cir. 1993); cf. *United States v. Anderson*, 923 F.2d 450, 455 n. 1 (6th Cir. 1991); *United States v. LaFrance*, 879 F.2d 1, 6–8 (1st Cir. 1989); *United States v. Zamora*, No. C. S-05-219-DFL, 2006 WL 1283215 at \*2–3 (E.D. Cal. May 10, 2006), affirmed, 303 F. App'x 385 (9th Cir. 2008). Nowadays police who stop a car for a non-criminal traffic violation tell the driver to remain in the car while they do a computer check of his license plate. So he is detained for a period of time. Yet even though the police have neither a reasonable suspicion (required for a *Terry* stop), nor probable cause to believe (required for an arrest), that the driver has committed a crime, the police action is reasonable, hence constitutional. See, e.g., *Berkemer v. McCarty*, 468 U.S. 420, 439–40 (1984); cf. *United States v. Childs*, 277 F.3d 947, 953 (7th Cir. 2002) (en banc).

Police often are summoned to a home because of a domestic altercation. And they may tell the quarreling couple not to leave while they try to ascertain the gravity of the quarrel. *Hiibel v. Sixth Judicial District Court*, 542 U.S. 177, 180–82 (2004); *United States v. LaFrance, supra*, 879 F.2d at 6–8. Detention in one's residence or office—in this case detention where one would be desperate to remain were there no police present—should not be automatically equated to being jailed, or hauled off in a paddy wagon. Better to be questioned for a time in one's home or other preferred location, and perhaps cleared of suspicion, than taken to the police station. Cf. *Hiibel v. Sixth Judicial District Court, supra*, 542 U.S. at 186. Hamilton was in her employer's home; her friend Davy was nearby; she was not questioned at length; she was not handcuffed; the police displayed puzzlement rather than antagonism; the visit did not culminate in an arrest and damaging admissions, as in such cases as *Orozco v.*

*Texas*, 394 U.S. 324, 326–27 (1969), and *Sprosty v. Buchler*, 79 F.3d 635, 642–43 (7th Cir. 1996), or lead to any criminal or civil proceeding against her. She seeks no damages for psychological distress, invasion of privacy, or damage to property—the typical grounds for relief in a Fourth Amendment case. Her only articulated theory of injury is that the police prevented her from taking and cashing the $10,000 check and thwarted (we're not sure how) her continued employment by Lorincz (for he still had a few months to live) and her receiving from him a power of attorney over his affairs. These are not damages of the kind sought in Fourth Amendment cases.

Until the police arrived Hamilton was in the Lorincz home voluntarily, planning to remain indefinitely. She changed her mind only because she wanted to make off with her $10,000 check before the police decided to take it from her. The police had grounds for suspicion that she had obtained the money improperly. Apart from the grounds noted earlier, we point out that $10,000 for 88 hours of home care equals $113.64 an hour, which is a preposterous rate for an amateur "home helper." And although Lorincz told the police that he wanted Hamilton to keep the check, sufferers from Parkinson's disease typically experience severe cognitive impairments as the disease worsens, Joseph Jankovic, "Parkinson's Disease: Clinical Features and Diagnosis," 79 *J. Neurology, Neurosurgery & Psychiatry* 368, 372 (2008); J.L.W. Bosboom, D. Stoffers & E. Ch. Wolters, "Cognitive Dysfunction and Dementia in Parkinson's Disease," 111 *J. Neural Transmission* 1303, 1304–06 (2004)—and Lorincz was near death. For the police not to have investigated conditions in the Lorincz residence, and instead let Hamilton walk off with the $10,000 check, would have been irresponsible. An

interpretation of the Fourth Amendment that would require them to have behaved in such a way would be unreasonable. And reasonableness is the touchstone of the amendment. The police conduct had a custodial dimension but was not an arrest and was justified by the sliding-scale approach taken by this court in the *Chaidez* decision.

Neither was the police officers' telling her to leave at the end of the two hours a seizure of her person within the meaning of the Fourth Amendment. See, e.g., *Sheppard v. Beerman*, 18 F.3d 147, 153 (2d Cir. 1994); cf. *United States v. Ojeda-Ramos*, 455 F.3d 1178, 1183–84 (10th Cir. 2006). A person is seized if a reasonable person in her position would think she wasn't free to leave the place she was in. *United States v. Mendenhall*, 446 U.S. 544, 553–54 (1980). And doubtless also if the person is physically restrained from entering a place; for there is a seizure whenever a police officer "by means of physical force or show of authority … in some way restrain[s] the liberty of a citizen." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16 (1968); see *Acevedo v. Canterbury*, 457 F.3d 721, 724–25 (7th Cir. 2006); *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1208 (8th Cir. 2013). But not every expulsion is a confinement, let alone a seizure. The police didn't touch Hamilton—didn't grab and fling her from the house, which could be a form of seizure. They didn't threaten her. They ordered her out, and she left. Had she refused to go, they would have had to arrest her to get her out, and we would have a different case.

She consistently has claimed that between the arrival of the police and their ordering her to leave the house two hours later she had *wanted* to leave. What happened to make her change her mind at the last minute and want to stay?

What happened was that she had wanted to leave *with the check*; when that proved impossible her best course of action was to wait until the police left, then get Lorincz to sign another check to her for $10,000, then rush to the bank to cash it. For the police to have let her remain after they left (even if they took the original check with them) would have been as irresponsible as for them to have let her leave with the check earlier.

Yet apparently she didn't return to the house, at least for a time, after the police left. Why not? Maybe Donald or Alice remained in the house to ward her off. We needn't try to solve the puzzle. There was no police misconduct. The dismissal of the suit is therefore

AFFIRMED.