In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-1900

ZACHARY MEDLOCK,

*Plaintiff-Appellant*,

*v.*

TRUSTEES OF INDIANA UNIVERSITY, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:11-cv-977-TWP-DKL — **Tanya Walton Pratt**, *Judge*.

ARGUED NOVEMBER 1, 2013 — DECIDED DECEMBER 30, 2013

Before POSNER, FLAUM, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. This is an eye-opening case, but not because of any legal profundities or political reverberations—rather because of the glimpse it affords into contemporary student and administrative cultures of American universities.

Zachary Medlock was in the spring of 2011 a sophomore at Indiana University's main campus, in Bloomington, living

by choice in a university dormitory. As a condition of being allowed to live there he was required to agree to comply with a long list of rules, one of which was that he allow health and safety inspections of his dorm room by "resident leadership specialists" (we'll call them "student inspectors"). They are graduate students employed part-time by the university to assist in dormitory management. Their duties include conducting the inspections. The students whose rooms are to be inspected must be given written notification of the inspection at least 24 hours in advance; Medlock had been given a week's notice by email and in addition the inspection of the dorm rooms on his floor was announced over the building's intercom on the day of the inspection. (His failure to use the abundant warning time to clean up his act is one of the mysteries of this case.) The inspectors inspect for violations of prohibitions in the code of conduct for dormitory residents. Those prohibitions are numerous—"from candles to cats" as one of the student inspectors testified—and of course include (illegal) drugs. Medlock does not question that he was subject to these prohibitions as a condition of being allowed to live in a university dormitory, and was subject to being penalized for violating them. Suspension and expulsion are among the authorized penalties.

At about 4 p.m. on the day scheduled for the inspection, one of the student inspectors entered Medlock's room (Medlock wasn't there) to inspect it, and upon entering noticed a clear plastic tube lying on the desk. Drawing on the training the university had given him to enable him to conduct a competent inspection, he surmised that the tube contained marijuana. Another student inspector, whom the first one asked to join him in Medlock's room, concurred.

One of the student inspectors called the Indiana University Police Department to report what they thought they'd discovered in Medlock's room. Like other large universities Indiana University has its own police department. It's a real police department—its police officers (of whom there are more than 40 on the Bloomington campus) have the same powers as police officers employed by cities and towns.

An Indiana University police officer (defendant Christopher King), summoned by one of the two student inspectors, arrived in Medlock's room, looked at the tube of marijuana, smelled raw marijuana, and left with the tube. The student inspectors remained, continuing their inspection and noticing burned candles, an ashtray containing ashes, and a rolled-up blanket at the bottom of the door to the bathroom, presumably intended to keep smoke from wafting into the bathroom (which Medlock shared with another student) while he smoked marijuana in his bedroom. Smoking of any kind is forbidden in the dormitory, as is possessing "open flame materials," such as candles.

One of the student inspectors noticed that the door to Medlock's closet was ajar, and peering through the opening he saw what he thought was a large marijuana plant. He summoned officer King, who looked in the closet and found himself face to face with a six-foot-high marijuana plant. He left to get a warrant to search the room for drugs and drug paraphernalia but posted another police officer in the room to make sure no one moved or destroyed anything that might be contraband.

The warrant was issued and the further search that King conducted pursuant to it revealed both paraphernalia commonly used in relation to marijuana—four conventional

pipes, two bongs (water pipes), and a fluorescent light (called a "grow light") for enabling a large marijuana plant to thrive in a closet—plus a total of 89 grams of marijuana (not including the plant itself, doubtless the source of the 89 grams). Not that the plant was thriving, despite its height; a closet is not the optimal environment for a tall plant.

Medlock was arrested and charged with possession of more than 30 grams of marijuana, a felony (he could also have been charged with manufacturing marijuana, also a felony). But for unexplained reasons the charges were dropped, although there can't have been any doubt of his guilt.

The university's dean of students immediately suspended Medlock for one year. But Medlock had a hearing before a university hearing commission 17 days later (spring break had intervened—otherwise the interval would have been only 9 or 10 days). The hearing commission affirmed the suspension (as did the university's provost, to whom Medlock appealed the commission's decision) and ordered him to vacate the dormitory forthwith. Although called a "suspension," this was more like an expulsion, because if he wanted to be reinstated he had to apply, after the year was up, and there was no guarantee that the application would be accepted. He applied for and was offered immediate admission to George Mason University, in Virginia (apparently without telling George Mason of the expulsion), but declined. Instead, after the year was up, he applied for readmission to IU at Bloomington. His application was granted, and he was readmitted when the school year began and was even given a part-time job by the university, on its informa-

tion technology staff—which seems odd, as it might give him access to the confidential record of his expulsion.

The suit is based on 42 U.S.C. § 1983, which authorizes suits against state or local officials who violate federally protected civil rights. The complaint names the university's trustees as defendants along with the dean of students, the university provost, the two student inspectors who searched Medlock's room, and officer King. It seeks a mandatory injunction ordering destruction of the record of his expulsion, and damages from the two student inspectors and King.

The litigation has attracted media attention. See, e.g., Dave Stafford, "7th Circuit Tosses IU Dorm-Search Lawsuit," *Indiana Lawyer*, June 29, 2012, www.theindianalawyer.com/-7th-circuit-tosses-iu-dorm-search-lawsuit/PARAMS/article/29121 (visited Dec. 28, 2013). Stafford's article refers to an earlier stage in the litigation, when we dismissed as moot Medlock's appeal from the denial of his motion for a preliminary injunction against the enforcement of the one-year suspension; the appeal was moot because the year was up, and so the injunction could have no effect. *Medlock v. Trustees of Indiana University*, 683 F.3d 880, 882 (7th Cir. 2012).

Medlock claims that the student inspectors plus King violated his Fourth Amendment right to be free from an unreasonable search. He also complains about not having been given a hearing before he was expelled, and we'll start there. The district court granted summary judgment for all defendants on all charges.

Medlock argues that the due process clause of the Fourteenth Amendment entitled him to such a hearing (that is, to

a "predeprivation hearing"). He is not seeking damages for that alleged denial of due process of law, but the denial if proved would be a ground for the expungement of the record of his expulsion, which is relief that he does seek.

There is no merit to the due process claim. The in-your-face flagrancy of Medlock's violation of university rules (he had plenty of warning of the impending inspection, remember), and of Indiana's criminal law, required the university to take immediate remedial action if its commitment to its rules, and to legality, was not to be questioned. See *Goss v. Lopez*, 419 U.S. 565, 581–83 (1975).

And even if—as we don't for a moment believe—the failure to give him a hearing before he was expelled denied him due process of law, we can't understand how the destruction of the record of his expulsion could be thought a proper remedy. It's not as if there's any doubt about his having violated not only the university's rules but also Indiana's criminal law. We have said and we repeat that "we are reluctant to encourage further bureaucratization by judicializing university disciplinary proceedings, mindful also that one dimension of academic freedom is the right of academic institutions to operate free of heavy-handed governmental, including judicial, interference." *Osteen v. Henley*, 13 F.3d 221, 225–26 (7th Cir. 1993).

Indiana University is a public university, owned by the State of Indiana, and the student inspectors and university police are university employees and therefore state actors. (We can't understand the defendants' argument, accepted by the district judge, that they were not state actors.) And so they can be sued under section 1983 for violating the Fourth Amendment, held protected against state action by interpre-

tation of the due process clause of the Fourteenth Amendment. But the exclusionary rule—the rule that renders evidence obtained in violation of the Fourth Amendment inadmissible in (some) judicial proceedings—is applicable only to criminal proceedings. See, e.g., *Pennsylvania Board of Probation & Parole v. Scott*, 524 U.S. 357, 363–64 (1998); *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1050 (1984); *United States v. Calandra*, 414 U.S. 338, 349–52 (1974); *Thompson v. Carthage School District*, 87 F.3d 979, 981–82 (8th Cir. 1996). The last of these cases involved, like this case, expulsion from a public school.

So the marijuana and drug paraphernalia seized from Medlock's room were admissible in the suspension proceeding (which was of course noncriminal)—and for the additional reason that Medlock didn't object to their admission in that proceeding. The seized items provided compelling evidence of serious violations of the code of conduct. His giant marijuana plant (a small tree, really) was providing him with dealer-quantity marijuana. And while the criminal charges against him were dropped, this could not have been for lack of evidence. The university's provost testified that the quantity of marijuana and marijuana paraphernalia found in Medlock's room made her suspect that he was distributing marijuana to other students. As the dean of students testified, "the quantity that we had here present was such that it was hard to believe it was for personal use" only. He added that "in [his] 17 years as being Senior Student Affairs Officer this ranks maybe first or second in terms of the amount of marijuana that I've seen at any one time taken from a room." And this was said when the dean thought that only 50 grams of marijuana had been found in Medlock's

room. When told it had been 89 grams he remarked: "that placed it certainly number one."

Although as we noted earlier the fruits of the search were admissible for disciplinary purposes even if obtained in violation of the Fourth Amendment, the violation of the amendment (if there was a violation) would entitle him to damages. *Hudson v. Michigan*, 547 U.S. 586, 597–98 (2006); *Guzman v. City of Chicago*, 565 F.3d 393, 398–99 (7th Cir. 2009); *Gonzalez v. Entress*, 133 F.3d 551, 553–54 (7th Cir. 1998); *Thompson v. Carthage School District, supra*, 87 F.3d at 981–82. But there was no violation. Medlock had consented in advance, as a condition of being allowed to live in the dormitory, to have his room searched for contraband and other evidence of violation of the health and safety code. He could have lived off campus and thus have avoided being governed by the code. He chose to trade some privacy for a dorm room. His expulsion amounted to holding him to his contract.

Even without explicit consent, and even if the student inspectors had been public officers, their search of Medlock's dorm room would have been a lawful regulatory search. Indiana University's student-housing code is the equivalent of a local housing code, and "it is difficult to enforce such a code without occasional inspections" and "impossible to rely on a system of inspections to enforce the code without making them compulsory, since violators will refuse to consent to being inspected. In these circumstances the Fourth Amendment's requirement that all search warrants be supported by 'probable cause' can be satisfied by demonstrating the reasonableness of the regulatory package that includes compulsory inspections." *Platteville Area Apartment Associa-*

*tion v. City of Platteville*, 179 F.3d 574, 578 (7th Cir. 1999); see, e.g., *Camara v. Municipal Court*, 387 U.S. 523, 536–38 (1967). Those cases involved warrants, but warrants are not required when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). Special needs are found in the school setting, *Board of Education of Independent School District No. 92 v. Earls*, 536 U.S. 822, 828–30 (2002); *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 652–53, 664–65 (1995), a setting in which requiring a search warrant "would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed." *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985); cf. *Osteen v. Henley, supra*, 13 F.3d at 225–26.

The search that officer King conducted before he obtained a warrant stands on a somewhat different footing. He was not a student inspector whom Medlock by deciding to live in the dorm had authorized to search his room. The *A to Z Guide*—the university's student-housing handbook—states that "authorized university personnel performing safety inspections may enter a room or apartment to ensure that health, fire, and safety regulations are being maintained" but that "no provision in the housing contract gives residence hall officials the authority to consent to a search of a resident's room or apartment by police or other government officials" and "any law enforcement agency having jurisdiction may, in performing its statutory duties, conduct a search [only] in accordance with legally defined procedures governing search and seizure."

But King's entry and search were superfluous events so far as harm to Medlock was concerned. The student inspec-

tors had already searched the room and found marijuana and other contraband. The closet door was open (Medlock does not deny this) and so the plant was in plain view—not all of it, but enough to make its character unmistakable. What King saw the student inspectors had seen. The intrusion on Medlock's privacy was complete before King entered. And if this is wrong and a third person's glimpse of the incriminating scene could be thought an incremental intrusion, liability would be blocked by the venerable principle of *de minimis non curat lex*, which has been held applicable to a variety of constitutional settings. E.g., *United States v. Jacobsen*, 466 U.S. 109, 120–21, 126 (1984); *Washington v. Hively*, 695 F.3d 641, 643 (7th Cir. 2012); *Brandt v. Board of Education*, 480 F.3d 460, 465 (7th Cir. 2007); *Hessel v. O'Hearn*, 977 F.2d 299, 302-04 (7th Cir. 1992); *Artes-Roy v. City of Aspen*, 31 F.3d 958, 962–63 (10th Cir. 1994) (a case factually rather similar to the present one).

Moreover, reasonableness is the touchstone of the Fourth Amendment, *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011); *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *Hamilton v. Village of Oak Lawn*, 735 F.3d 967, 971 (7th Cir. 2013), and officer King was acting reasonably in backing up the student inspectors. They had entered Medlock's dorm room lawfully and a plain-view search had revealed marijuana. What were they to do? Remove the suspected marijuana from the room? But they are just students, and the university administration may not want its student inspectors to be seen in the hallways of the dorm carrying quantities of illegal drugs (especially a six-foot-tall marijuana plant) and drug paraphernalia, and may want their suspicions of possible criminal activity confirmed or dispelled forthwith by a police officer. It thus was sensible of the students to summon a university

police officer to confirm their suspicion that they had found marijuana and other contraband and to remove the stuff.

There is no suggestion of pretext or bad faith on the part of any of the defendants. Officer King did not set out to take advantage of a pre-existing student inspection, and the students did not enter Medlock's dorm room for law enforcement purposes. By the time King became aware of the inspection and entered the room, the student inspectors had searched it—lawfully.

In short, the case is near frivolous, the decision to sue the two student inspectors offensive, and the most surprising feature of the entire episode is the exceptional lenity with which a state university (in a state that does not allow medicinal, let alone recreational, use of marijuana) treated a brazen violator of its rules of conduct and of the criminal law. But as we noted some years ago, "the danger that without the procedural safeguards deemed appropriate in civil and criminal litigation public universities will engage in an orgy of expulsions is slight. The relation of students to universities is, after all, essentially that of customer to seller." *Osteen v. Henley, supra*, 13 F.3d at 226. And if we may judge from the happy ending of the marijuana bust for Medlock, the customer is indeed always right.

AFFIRMED.